[No. B205919. Second Dist., Div. Three. May 14, 2009.]

ESTHER ELKMAN, Plaintiff and Appellant, v.
NATIONAL STATES INSURANCE COMPANY, Defendant and
Respondent.

1306

**COUNSEL**

Parisi & Havens, David C. Parisi and Suzanne Havens Beckman for Plaintiff and Appellant.

Manning & Marder, Kass, Ellrod, Ramirez, James E. Gibbons and Tony D. Shin for Defendant and Respondent.

## OPINION

CROSKEY, J.—Plaintiff and appellant Esther Elkman (Elkman) appeals an order granting a motion to quash service of summons and complaint filed by defendant and respondent National States Insurance Company (National).[1]

National, an out-of-state insurer which is not licensed or authorized to do business in California, receives insurance premiums from California and processes and pays claims submitted by its insureds who are domiciled in this state. The essential issue presented is whether such circumstances provide a basis to justify the imposition of either general or specific jurisdiction over National in California.

We conclude no basis is present here. National did not subject itself to either general or specific jurisdiction in California merely by accepting premium payments from California and by processing and paying claims submitted by its California insureds for services rendered in this state. Thus, the trial court properly found National lacks sufficient contacts with California for jurisdiction to attach. Therefore, the order granting the motion to quash is affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

1. *Overview.*

In 1998, National, a Missouri corporation, issued a long-term care insurance policy to Elkman. The policy was delivered to Elkman at her residence in Pompano Beach, Florida.

The policy contained a provision stating, "Policy guaranteed renewable for life at your option subject to our table of premium rates in effect at time of renewal." The "guaranteed renewable" provision was mandated by Florida law.[2]

In December 2001, Elkman relocated to Sherman Oaks, California. In April 2004, Elkman made a claim to National for benefits under the policy. The policy's schedule of benefits specifies a home care benefit maximum of

---

[1] An order granting a motion to quash service of summons is appealable. (Code Civ. Proc., § 904.1, subd. (a)(3).)

[2] We take judicial notice of the long-term care guide for consumers issued by the Florida Department of Financial Services. (Evid. Code, §§ 452, subd. (c), 459.)

24 months. For a two-year period, National paid for home health care services needed by Elkman pursuant to its contractual obligations under the policy.

At the end of the two-year period, on May 17, 2006, National's claims department sent a letter to Elkman stating she had reached the maximum benefit limit of her policy. The letter explained, "Generally, you must have a period of at least 180 consecutive days during which you require no assistance and/or receive no care or services, in order for benefits to be restored." The letter advised: "If you anticipate recovery or an improvement in your condition, and feel there is a possibility you may be able to meet the policy requirements to restore your benefits at some time in the future, then you may want to continue to pay premiums to keep the coverage in force. If you do not feel you will be able to meet those requirements, and therefore would not be able to derive any future benefits from your policy, you may decide it is in your best interest to cancel the policy. It is entirely your choice. The policy is guaranteed renewable, which means you have the right to continue this policy as long as you pay your premiums on time."

### 2. *Pleadings.*

On July 9, 2007, Elkman filed suit against National in the Los Angeles Superior Court, alleging causes of action for breach of contract, breach of the implied covenant of good faith and fair dealing, and elder abuse. Elkman disputed National's interpretation of the policy, alleging that after the two-year period ended, she ceased using home care services as defined by the policy, and instead, occasionally received assistance from an unlicensed caregiver. Elkman pled that after six months of receiving no benefits from National, she was entitled to file a new claim requesting that National once again pay for home health care services pursuant to the policy.

### 3. *National's Motion to Quash.*

On or about September 10, 2007, National specially appeared and filed a motion to quash service of summons and complaint on the ground of lack of personal jurisdiction over National. The motion asserted insufficient contacts between National and California to support any constitutional basis for jurisdiction over it.

The supporting declaration of William Morrison, a vice-president of National, set forth the following jurisdictional facts: National is a Missouri corporation and is licensed or authorized to do business only in certain states.

National is not, and never has been, licensed or authorized to do business in California. National is licensed and/or authorized to do business in Florida. National maintains no office or bank account in California, nor does it have any agents licensed to sell National's insurance products in California. National has never advertised its insurance products for sale in California. National has never sought or received approval from California's Department of Insurance for the issuance or delivery of its insurance products in California, nor has National ever issued or delivered its insurance products in California.[3]

### 4. *Opposition.*

In opposition, Elkman asserted National's contacts with California justify the exercise of general jurisdiction. Elkman relied on a letter from National's counsel which indicated "there were 321 health policies billed to California addresses during approximately the past five years, and 68 life insurance policies billed to California addresses during the same time period."[4] Elkman argued National maintained ongoing, systematic contact with at least 389 California residents—in addition to collection of premiums from California customers, National "investigates, adjusts, pays, and denies claims in California." These ongoing contacts "with California's citizens, regardless of [National's] formal relationship to the Department of Insurance or Secretary of State, warrant general jurisdiction."

Elkman further contended California has specific jurisdiction over National on the ground that National has purposefully availed itself of the privilege of conducting business in California "by maintaining insureds throughout the State, paying and denying claim benefits in the State, and continuing to collect significant premium monies from nearly 400 California residents over the last five years. . . . Further, [National] clearly has continuing obligations to California residents through the policies it has in force and issued to California insureds, such as Ms. Elkman."

Elkman's papers also included as an exhibit a copy of a March 2004 report by the U.S. Department of Commerce concerning the mobility of the United States population. Elkman argued that given the high degree of mobility of the American population, and consequently National's insureds, National

---

[3] Thereafter, the parties stipulated to extend the time for Elkman to file her opposition papers to enable Elkman to conduct discovery with respect to the issue of jurisdiction.

[4] The letter pointed out this did not mean there were 389 insureds actually residing in California; rather, only that there were 389 policies billed to California addresses.

reasonably could anticipate being brought into courts in states to which its insureds had migrated.

### 5. *Reply.*

National disputed Elkman's attempt to characterize the 389 premium payers in California as a substantial number, pointing out that those 389 policies represented a mere 0.337 percent of National's 115,415 policies in force during the relevant timeframe. National contended its contacts with California were "minuscule" at best and certainly not enough to subject it to general or specific jurisdiction.

National denied it had purposefully availed itself of conducting activities in California—it issued and delivered the policy to Elkman in Florida and had no input into Elkman's later unilateral decision to relocate to California.

National also objected to the admission of the Commerce Department report as hearsay.

### 6. *Trial Court's Ruling.*

On December 18, 2007, the matter came on for hearing and was taken under submission. Thereafter, the trial court issued an order granting the motion to quash "on grounds set forth in the moving papers. There is not a basis for general or specific jurisdiction." The trial court also sustained National's objection to the Commerce Department report proffered by Elkman.

Elkman filed a timely notice of appeal from the order granting National's motion to quash.

## CONTENTIONS

Elkman argues that the trial court erred in failing to find that National's contacts with California justify the exercise of general or specific jurisdiction in this state. She contends that National's receipt of premium payments from California residents and its adjustment of claims submitted by California insureds are sufficient to establish a basis for jurisdiction in California.

## DISCUSSION

### 1. *Scope of Review of Order on Motion to Quash; Plaintiff's Burden.*

■ Where a nonresident defendant challenges jurisdiction by way of a motion to quash, the plaintiff bears the burden of establishing by a preponderance of the evidence that minimum contacts exist between the defendant and

the forum state to justify imposition of personal jurisdiction. (*Evangelize China Fellowship, Inc. v. Evangelize China Fellowship* (1983) 146 Cal.App.3d 440, 444 [194 Cal.Rptr. 240]; *Kroopf v. Guffey* (1986) 183 Cal.App.3d 1351, 1356 [228 Cal.Rptr. 807]; *Edmunds v. Superior Court* (1994) 24 Cal.App.4th 221, 228 [29 Cal.Rptr.2d 281] (*Edmunds*).) The plaintiff must present facts " 'demonstrating that the conduct of defendants related to the pleaded causes [of action] is such as to constitute constitutionally cognizable "minimum contacts." [Citation.]' " (*Edmunds, supra*, at p. 228.)

Evidence of the jurisdictional facts or their absence may be in the form of declarations. (*Evangelize China Fellowship, Inc. v. Evangelize China Fellowship, supra*, 146 Cal.App.3d at p. 444.) Where there is a conflict in the declarations, resolution of the conflict by the trial court will not be disturbed on appeal if the determination is supported by substantial evidence. (*Ibid.*; *Edmunds, supra*, 24 Cal.App.4th at p. 228.) However, where the evidence of jurisdictional facts is *not* conflicting, the question of whether a defendant is subject to personal jurisdiction is one of law. (*Edmunds, supra*, at p. 228.)

2. *General Principles Relevant To Jurisdiction.*

California's long-arm statute provides: "A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States." (Code Civ. Proc., § 410.10.)

■ The exercise of jurisdiction over a nonresident defendant "comports with these Constitutions 'if the defendant has such minimum contacts with the state that the assertion of jurisdiction does not violate " 'traditional notions of fair play and substantial justice.' " ' (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444 [58 Cal.Rptr.2d 899, 926 P.2d 1085] (*Vons*), quoting *Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 316 [66 S.Ct. 154, 158, 90 L.Ed. 95] (*Internat. Shoe*).)" (*Pavlovich v. Superior Court* (2002) 29 Cal.4th 262, 268 [127 Cal.Rptr.2d 329, 58 P.3d 2] (*Pavlovich*).)

Under the minimum contacts test, " 'an essential criterion in all cases is whether the "quality and nature" of the defendant's activity is such that it is "reasonable" and "fair" to require him to conduct his defense in that State.' (*Kulko v. California Superior Court* (1978) 436 U.S. 84, 92 [98 S.Ct. 1690, 1697, 56 L.Ed.2d 132], quoting *Internat. Shoe, supra*, 326 U.S. at pp. 316–317, 319 [66 S.Ct. at pp. 158, 159–160].) '[T]he "minimum contacts" test . . . is not susceptible of mechanical application; rather, the facts of each case must be weighed to determine whether the requisite "affiliating

circumstances" are present.' (*Kulko*, at p. 92 [98 S.Ct. at p. 1697], quoting *Hanson v. Denckla* (1958) 357 U.S. 235, 246 [2 L.Ed.2d 1283, 78 S.Ct. 1228, 1235] (*Hanson*).) '[T]his determination is one in which few answers will be written "in black and white. The greys are dominant and even among them the shades are innumerable." ' (*Kulko*, at p. 92 [98 S.Ct. at p. 1697], quoting *Estin v. Estin* (1948) 334 U.S. 541, 545 [68 S.Ct. 1213, 1216, 92 L.Ed. 1561, 1 A.L.R.2d 1412].)" (*Pavlovich, supra*, 29 Cal.4th at p. 268.) Depending upon the extent of a nonresident defendant's contacts with the forum state, the defendant may be subject either to *general* jurisdiction, or to *specific* jurisdiction. (*Id.* at pp. 268–269.)

■ If a nonresident defendant's activities "may be described as 'extensive or wide-ranging' [citation] or 'substantial . . . continuous and systematic' [citation], there is a constitutionally sufficient relationship to warrant jurisdiction for all causes of action asserted against him. In such circumstances, it is not necessary that the specific cause of action alleged be connected with the defendant's business relationship to the forum." (*Cornelison v. Chaney* (1976) 16 Cal.3d 143, 147 [127 Cal.Rptr. 352, 545 P.2d 264] (*Cornelison*); accord, *Vons Companies, Inc. v. Seabest Foods, Inc., supra*, 14 Cal.4th at p. 445.) In other words, if a defendant corporation's activities in the forum "are so 'continuous and systematic' *that the corporation may in fact be said already to be 'present' there*, it may also be served in causes of action unrelated to its forum activities." (*Wells Fargo & Co. v. Wells Fargo Exp. Co.* (9th Cir. 1977) 556 F.2d 406, 413, italics added.)

If, however, "the defendant's activities in the forum are not so pervasive as to justify the exercise of general jurisdiction over him, then jurisdiction depends upon the quality and nature of his activity in the forum in relation to the particular cause of action." (*Cornelison, supra*, 16 Cal.3d at pp. 147–148.) When determining whether specific jurisdiction exists, courts consider the relationship among the defendant, the forum, and the litigation. (*Pavlovich, supra*, 29 Cal.4th at p. 269.) A court may exercise specific jurisdiction over a nonresident defendant only if (1) the defendant has *purposefully availed* himself or herself of forum benefits; (2) the controversy is related to or arises out of the defendant's contacts with the forum; and (3) the assertion of personal jurisdiction would comport with fair play and substantial justice. (*Ibid.*)

Here, there is no substantial conflict in the evidence of jurisdictional facts. Our role on review is simply to determine the legal effect of National's contacts with California, specifically, whether those contacts are sufficient either for general or specific jurisdiction to attach.

### 3. Trial Court Properly Found National's California Contacts Are Insufficient to Give Rise to General Jurisdiction.

#### a. Pertinent Case Law.

The "standard for establishing general jurisdiction is 'fairly high,'" *Brand v. Menlove Dodge*, 796 F.2d 1070, 1073 (9th Cir. 1986), *and requires that the defendant's contacts be of the sort that approximate physical presence. See Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1331 (9th Cir. 1984). Factors to be taken into consideration are whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." (*Bancroft & Masters, Inc. v. Augusta Nat. Inc.* (9th Cir. 2000) 223 F.3d 1082, 1086, italics added, citing *Hirsch v. Blue Cross, Blue Shield of Kansas City* (9th Cir. 1986) 800 F.2d 1474, 1478 (*Hirsch*); see, e.g., *Gates Learjet Corp. v. Jensen* (9th Cir. 1984) 743 F.2d 1325, 1331 [making telephone calls and sending telexes and letters to Tucson do not demonstrate sufficient activity to support a finding of general jurisdiction in Arizona].)

In *Hirsch, supra*, 800 F.2d 1474, defendant Blue Cross, Blue Shield of Kansas City (Blue Cross) was incorporated in Missouri and also authorized to conduct business in Kansas. Its principal place of business was in Missouri. Southwest Freight Lines (Southwest), Terrance Hirsch's former employer, had its home office in Kansas City, Kansas. (*Id.* at p. 1476.) Blue Cross was not licensed nor authorized to do business in states other than Kansas and Missouri. Blue Cross entered into prepaid health care agreements only with employers or individuals who did business in or resided in one of a limited number of counties in Missouri or Kansas. (*Ibid.*)

In January 1983, Southwest contracted with Blue Cross to provide group health care coverage for Southwest's employees. Under the enrollment agreement, all of Southwest's full-time employees were eligible to participate. The eligibility clause did not contain any geographical exclusions, nor did it restrict participation to employees as of the agreement's execution date. At the time Blue Cross and Southwest signed the contract, Southwest had 64 employees, 40 percent of whom lived outside the Kansas and Missouri area. Although the employees were located in several states, none of them lived in California. (*Hirsch, supra*, 800 F.2d at p. 1476.)

After the contract was signed, Southwest hired Terrance Hirsch, who, with his wife, lived in California. During the period covered by the agreement, Southwest added the Hirsches and two other new California employees to the

Southwest group policy. Southwest deducted health care premiums from Hirsch's payroll checks, and forwarded the payments to Blue Cross. Starting in October 1983, the Hirsches' daughter received medical treatment in California. The Hirsches alleged that in March 1984, Blue Cross refused to pay incurred medical expenses. The Hirsches filed an action in California state court, claiming breach of contract and bad faith. (*Hirsch, supra*, 800 F.2d at pp. 1476–1477.)

Blue Cross removed the action to federal court on diversity grounds, and then filed a motion to dismiss for lack of personal jurisdiction. The district court granted the motion. (*Hirsch, supra*, 800 F.2d at p. 1477.) The Ninth Circuit reversed, finding no basis for general jurisdiction (but went on to hold that Blue Cross was subject to specific jurisdiction based on purposeful availment). (*Id.* at pp. 1478–1482.)

In approaching the issue of general jurisdiction, the *Hirsch* court stated: "To determine if a defendant's activities qualify as 'continuous and systematic' or 'substantial' we examine all of the defendant's activities that impact the state, including whether the defendant makes sales, solicits or engages in business, serves the state's markets, designates an agent for service of process, holds a license, has employees, or is incorporated there. [Citations.]" (*Hirsch, supra*, 800 F.2d at p. 1478.) The *Hirsch* court observed: "Blue Cross of Kansas City is not authorized nor licensed to do business in California; it is not registered with the California Department of Insurance; it does not maintain an office or mailing address there; it has no agent for service of process, sales representatives, or employees in California; and it pays no California taxes. *The company's only proven contact with California was through its relationship with the Hirsches and Southwest's other California employees.* Neither party contends that these contacts with California are sufficient to permit the exercise of general jurisdiction in this case. We also conclude that they are not." (*Hirsch, supra*, 800 F.2d at p. 1478, italics added.)

b. *No Basis for General Jurisdiction in This Case.*

*Hirsch* is directly on point. Here, the evidence is undisputed that National is a Missouri corporation and is licensed or authorized to do business only in certain states. National is not, and never has been, licensed or authorized to do business in California. National maintains no office or bank account in California, nor does it have any agents licensed to sell its insurance products in California. Further, National has never advertised its insurance products for sale in California. National has never sought or received approval from California's Department of Insurance for the issuance or delivery of its

insurance products in California, nor has National ever issued or delivered its insurance products in California.

Guided by *Hirsch, supra,* 800 F.2d at page 1478, we conclude the mere fact that several hundred California residents remit premium payments to National, and that National, in the performance of its contractual obligations, processes and pays claims submitted by its insureds who are domiciled in California, without more, does not support a finding of general jurisdiction.

We now turn to the issue of specific jurisdiction.

### 4. *Trial Court Properly Found National's California Contacts Are Insufficient to Support an Exercise of Specific Jurisdiction.*

#### a. *General Principles.*

As stated in *Pavlovich, supra,* 29 Cal.4th at page 269, " 'The purposeful availment inquiry . . . focuses on the defendant's intentionality. [Citation.] This prong is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on' his contacts with the forum. [Citation.] Thus, the ' "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts [citations], *or of the "unilateral activity of another party or a third person."* [Citations.]' (*Burger King*[ *Corp. v. Rudzewicz* (1985)] 471 U.S. [462,] 475 [85 L.Ed.2d 528, 105 S.Ct. 2174, 2183].) 'When a [defendant] "purposefully avails itself of the privilege of conducting activities within the forum State," [citation], it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State.' (*World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 297 [100 S.Ct. 559, 567, 62 L.Ed.2d 490] (*World-Wide Volkswagen*).)" (29 Cal.4th at p. 269, italics added.)

#### b. *Examples of Purposeful Availment by Out-of-state Insurer.*

An example of purposeful availment by an insurer appears in *McGee v. International Life Ins. Co.* (1957) 355 U.S. 220 [2 L.Ed.2d 223, 78 S.Ct. 199] (*McGee*). There, the defendant insurance company was required to defend an action in California, the state of plaintiff's residence, based on the insurer's contacts with California, which contacts consisted of the solicitation of, and

receipt of premiums for, the life insurance contract being sued on. *McGee* held that, notwithstanding the attenuated nature of the relationship between the defendant and California, the contract sued upon had a substantial connection to the defendant's activities here and that California "had an interest in providing effective redress for its residents when nonresident insurers refused to pay claims *on insurance solicited here.*" (*Cornelison, supra,* 16 Cal.3d at p. 150, fn. 7, italics added.)[5]

Another example of purposeful availment is found in *Hirsch, supra,* 800 F.2d 1474. Although *Hirsch* held Blue Cross's contacts with California were insufficient for general jurisdiction (*id.* at p. 1478), it also found Blue Cross purposefully availed itself of the benefits and protections of the California forum so as to give rise to specific jurisdiction. (*Id.* at p. 1480.) The evidence showed "*Blue Cross freely negotiated the Enrollment Agreement with Southwest, to cover all of its employees, knowing that Southwest employed people nationwide.*" (*Id.* at p. 1479, italics added.) In addition, multiple California residents were enrolled in Southwest's Blue Cross plan while they were already residents of this state. By way of contrast, in the case before us the insured moved to California *after* purchasing National's long-term care policy. In the *Hirsch* case, Blue Cross, "*through its own actions . . .* created a continuing obligation to [its California insureds], and a substantial connection with California." (*Id.* at pp. 1479–1480, italics added.) The same cannot be said of National in this case.

> c.  *Pertinent Case Law Regarding Out-of-state Insurer's Payment of Claims to a Forum State Supports the Conclusion That National Did Not Purposefully Avail Itself of Forum Benefits.*

■ There is a dearth of California appellate law on point. However, guided by case law in other jurisdictions, we conclude a nonresident insurer does not subject itself to personal jurisdiction in a forum state merely by accepting premium payments sent from the forum state and by processing and paying claims submitted by its insureds for treatment rendered in the forum state.

In *Whittaker v. Medical Mut. of Ohio* (D.Kan. 2000) 96 F.Supp.2d 1197, 1200–1201 (*Whittaker*), the Kansas federal district court concluded it lacked jurisdiction over an Ohio insurer of a patient who had moved to Kansas to seek medical treatment. The Ohio insurer allegedly told the insured the

---

[5] In the instant case, it is undisputed that National did not *solicit* any business in California, nor could it do so, because it is not licensed or authorized to do business in this state.

treatment would be covered under the insurer's plan. The insurer paid the patient's Kansas medical bills for a year but stopped paying after determining that under Ohio law, the insured's treatments were not medically necessary. (*Id.* at p. 1199.) The insured sued in Kansas federal district court to challenge the insurer's determination. The district court rejected the insured's argument that the Ohio insurer's assurance of coverage, payment of some of the Kansas medical bills, and sending notice of nonpayment to Kansas established minimum contacts in Kansas. The court held that because "[*i*]*t was* [*the insured's*] *unilateral decision to seek treatment in Kansas which caused defendants to have to send payments and notice into Kansas,*" such contacts were legally insufficient for a finding the insurer purposefully availed itself of the benefits of doing business in Kansas. (*Id.* at pp. 1200–1201, italics added.)

As the *Whittaker* court explained, the insurance contract, designed to benefit Ohio teachers, was entered into by the plaintiff when she was a resident of Ohio. At the time of contracting, when the plaintiff became eligible for benefits under the plan, she was a resident of Ohio. Therefore, sending payment, notice of nonpayment, and other communications into Kansas, *as a result of the plaintiff's move to Kansas*, were not legally sufficient to establish personal jurisdiction. (*Whittaker, supra,* 96 F.Supp.2d at p. 1201.) The fact that the insurer may have told the insured that treatment in Kansas would be covered did not support personal jurisdiction in Kansas: "As to [said] contact, [*the insurer*] *is obligated to carry out its insurance contracts no matter in which state treatment is sought.* Therefore, the fact that Medical Mutual acknowledged its obligation to pay under the insurance plan if plaintiff sought treatment in Kansas is not purposeful availment." (*Id.* at p. 1200, italics added.)

*Bayada Nurses, Inc. v. Blue Cross Blue Shield of Michigan* (E.D.Pa., July 30, 2008, No. 08-1241) 2008 WL 2945388 (*Bayada*),[6] is in accord. In *Bayada,* a Michigan insurer paid a Pennsylvania nursing-services provider for nearly three years for treating a retired beneficiary who lived in North Carolina. Before the payments, there were at least two phone conversations between the provider and the insurer discussing coverage. The *Bayada* court found the insurer was not subject to specific jurisdiction in Pennsylvania. The

---

[6] Although *Bayada,* a United States District Court decision, is not published in the Federal Supplement, it is citable notwithstanding California Rules of Court, rule 8.1115(a). That rule only bars the citation of unpublished *California* opinions. Therefore, unpublished federal decisions are citable as persuasive, although not precedential, authority. (*City of Hawthorne ex rel. Wohlner v. H&C Disposal Co.* (2003) 109 Cal.App.4th 1668, 1678, fn. 5 [1 Cal.Rptr.3d 312].)

court reasoned the insurer's payments to Pennsylvania were the result of the beneficiary's selection of the nursing provider, not the insurer's choice to do business with the provider in Pennsylvania. The court held the telephone calls and payments did not establish specific jurisdiction in Pennsylvania.

Another example is *Berg v. Blue Cross and Blue Shield of Utica-Watertown, Inc.* (N.D.Cal., Nov. 2, 1993, No. C-93-2752-DLJ) 1993 WL 467859 (*Berg*),[7] which involved a New York insurer that had authorized the insured's care in California and paid the insured's California hospital bills in part. The California federal district court rejected the insured's argument the insurer's initial payment of the claims bearing a California address "without comment" constituted purposeful availment by the insurer. The court emphasized that for jurisdictional purposes, the proper inquiry was whether the insurer had taken purposeful steps to avail itself of benefits from activities related to California, or whether the insurer was merely responding to unilateral actions taken by the insured. Finding the latter, the *Berg* court held that it lacked specific jurisdiction. (See also *Hunt v. Erie Ins. Group* (9th Cir. 1984) 728 F.2d 1244, 1248 [east coast insurer did not purposefully avail itself of privilege of conducting business in California by mailing to California payments it conceded were due on the policy after plaintiff moved to the state].)

At least two cases reach a different result. In *Peay v. Bellsouth Medical Assistance Plan* (10th Cir. 2000) 205 F.3d 1206, 1213 (*Peay*), the court held a Georgia health plan had sufficient contacts with Utah to satisfy due process. The case involved payment for psychiatric treatment for a Tennessee insured at a Utah facility. The *Peay* court noted the defendants "precertified [the patient's] treatment at a Utah hospital and paid [the doctor], a Utah resident, for a portion of [the patient's] care." (*Ibid.*) *Peay* concluded that "[b]ecause defendants rendered benefits in Utah, they knew or should have known that a dispute over benefits could arise in Utah." (*Ibid.*, italics added.)

Similarly, in *Nieves v. Houston Industries, Inc.* (M.D.La. 1991) 771 F.Supp. 159, 160 (*Nieves*), the court concluded it had jurisdiction over a Texas health plan that had permitted the insured to keep her medical coverage while she lived in Louisiana during a leave of absence from her Texas employment. During the insured's stay in Louisiana, the insurer paid some claims for treatment she received from her Louisiana doctors but denied others. The district court concluded it had personal jurisdiction because on these facts, the insurer "*could reasonably have anticipated that any medical claims which*

---

[7] See footnote 6, *ante.*

*may be denied by the Plan may have required the defendant to defend its position in the state of Louisiana." (Ibid.,* italics added.)

██ The holdings of *Peay* and *Nieves* stress it was *foreseeable* to the insurer it would be sued in the state where it paid claims for its insured's medical treatment in a dispute over those claims or payments. However, as properly pointed out in *St. Luke's Episcopal Hospital v. Louisiana Health Service & Indem. Co.* (S.D.Tex., Jan. 6, 2009, No. H-08-1870) 2009 WL 47125[8] in its criticism of *Peay* and *Nieves,* " ' "foreseeability" alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause.' *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. at p. 295." (Accord, *Pavlovich, supra,* 29 Cal.4th at p. 272 [foreseeability of causing injury in another state is not a sufficient benchmark for exercising personal jurisdiction].)

██ After a review of these authorities, we conclude that National did not subject itself to specific jurisdiction in California merely by accepting premium payments from California and by processing and paying claims submitted by its insureds for services rendered in this state. National did not "come here" voluntarily, no matter how many insureds did. It was the unilateral decisions of Elkman and other insureds to relocate to California which caused National to accept payments from this state and to process and pay claims for services rendered in this state. These circumstances do not support a finding National purposefully availed itself of forum benefits so as to make it subject to specific jurisdiction in California.[9]

### d. *Remaining Issues Not Reached.*

Because National has not purposefully availed itself of forum benefits, it is unnecessary to address the other prerequisites for the exercise of specific jurisdiction over a nonresident defendant, i.e., whether the controversy is related to or arises out of the defendant's contacts with the forum, and whether the assertion of personal jurisdiction would comport with fair play and substantial justice. (*Pavlovich, supra,* 29 Cal.4th at p. 269.)

### DISPOSITION

The order granting the motion to quash is affirmed. The parties shall bear their respective costs on appeal.

Kitching, J., concurred.

---

[8] See footnote 6, *ante.*

[9] The fact that a state may have a strong interest in providing a forum is insufficient by itself to create a basis for jurisdiction. (*Pennsylvania Health & Life Ins. Guaranty Assn. v. Superior Court* (1994) 22 Cal.App.4th 477, 488 [27 Cal.Rptr.2d 507].)

**KLEIN, P. J.,** Concurring.—I concur. In view of the current state of the law, represented by *Internat. Shoe Co. v. Washington* (1945) 326 U.S. 310, 316 [90 L.Ed. 95, 66 S.Ct. 154] (*Internat. Shoe*) and its progeny, California lacks sufficient minimum contacts with defendant for the exercise of either general or specific jurisdiction.

However, I write separately to reiterate the view expressed by Justice Brennan in his dissenting opinion in *World-Wide Volkswagen Corp. v. Woodson* (1980) 444 U.S. 286, 299 [62 L.Ed.2d 490, 100 S.Ct. 559], that the standards enunciated in *Internat. Shoe* and its progeny "may already be obsolete as constitutional boundaries."

Justice Brennan observed "Though its flexible approach represented a major advance, the structure of our society has changed in many significant ways since *International Shoe* was decided in 1945. Mr. Justice Black, writing for the Court in *McGee* v. *International Life Ins. Co.*, 355 U.S. 220, 222 [2 L.Ed.2d 223, 78 S.Ct. 199] (1957), recognized that 'a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents.' He explained the trend as follows: [¶] 'In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity.' (*Id.*, at [pp.] 222–223.)" (*World-Wide Volkswagen Corp. v. Woodson, supra,* 444 U.S. at p. 308 (dis. opn. of Brennan, J.).)

Justice Brennan continued: "As the Court acknowledges, *ante,* [444 U.S.] at [pp.] 292–293, both the nationalization of commerce and the ease of transportation and communication have accelerated in the generation since 1957. [Fn. omitted.] The model of society on which the *International Shoe* Court based its opinion is no longer accurate. Business people, *no matter how local their businesses, cannot assume that goods remain in the business' locality.* Customers and goods can be anywhere else in the country usually in a matter of hours and always in a matter of a very few days." (*World-Wide Volkswagen*

*Corp. v. Woodson, supra*, 444 U.S. at pp. 308–309 (dis. opn. of Brennan, J.), italics added.)

Justice Brennan also cited statistics to "help illustrate the amazing expansion in mobility since *International Shoe*. The number of revenue passenger-miles flown on domestic and international flights increased by nearly three orders of magnitude between 1945 (450 million) and 1976 (179 billion). U.S. Department of Commerce, Historical Statistics of the United States, pt. 2, p. 770 (1975); U.S. Department of Commerce, Statistical Abstract of the United States 670 (1978). Automobile vehicle-miles (including passenger cars, buses, and trucks) driven in the United States increased by a relatively modest 500% during the same period, growing from 250 billion in 1945 to 1,409 billion in 1976. Historical Statistics, *supra*, at [p.] 718; Statistical Abstract, *supra*, at [p.] 647." (*World-Wide Volkswagen Corp. v. Woodson, supra*, 444 U.S. at pp. 308–309, fn. 13 (dis. opn. of Brennan, J.).)

In the 29 years since Justice Brennan authored his dissenting opinion in *World-Wide Volkswagen*, these trends have only accelerated. Therefore, the necessity for a revisiting of *Internat. Shoe* is even greater today.

I also write separately in order to point out that this is a close case. As our Supreme Court recognized in *Pavlovich v. Superior Court* (2002) 29 Cal.4th 262 [127 Cal.Rptr.2d 329, 58 P.3d 2], the minimum contacts test is not susceptible of mechanical application. This determination " 'is one in which few answers will be written "in black and white. The greys are dominant and even among them the shades are innumerable." ' " (*Id.* at p. 268.)

In *Hirsch v. Blue Cross, Blue Shield of Kansas City* (9th Cir. 1986) 800 F.2d 1474 (*Hirsch*), the evidence showed *"Blue Cross freely negotiated the Enrollment Agreement with Southwest, to cover all of its employees, knowing that Southwest employed people nationwide."* (*Id.* at p. 1479, italics added.) Thus, Blue Cross, *"through its own actions* . . . created a continuing obligation to [its California insureds], and a substantial connection with California." (*Id.* at pp. 1479–1480, italics added.) These circumstances gave rise to specific jurisdiction over Blue Cross in California.

*Hirsch* is not all that different from the instant case. Here, National States Insurance Company (National) issued a guaranteed renewable long-term care insurance policy to Esther Elkman (Elkman) in Florida. In view of the fact said policy was guaranteed renewable, coupled with the reality of a highly mobile society, it seems self-evident that National knew it was creating a continuing obligation with Elkman and other insureds throughout the country.

Further, in *Hirsch*, the nonresident insurer only had a handful of insureds in California, namely, the Hirsches and two other employees. (*Hirsch, supra*, 800 F.2d at pp. 1476–1477.) Here, in contrast, National has 389 premium payers with California addresses. Although that number is not sufficient to give rise to general jurisdiction, if a nonresident insurer has a critical mass of insureds in California, it would follow that the nonresident insurer's activities in the forum are so continuous and systematic "that the corporation may in fact be said already to be 'present' there." (*Wells Fargo & Co. v. Wells Fargo Exp. Co.* (9th Cir. 1977) 556 F.2d 406, 413.) What constitutes a critical mass of insureds remains open for another day.